# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

CJS SOLUTIONS GROUP, LLC,
d/b/a The HCI Group,

        Plaintiff,

vs.                                 Case No. 3:20-cv-65-MMH-JRK

STEPHEN TOKARZ, an individual,
JASON HUCKABAY, an individual,
and ELLIT GROUPS, LLC a Texas
limited liability company,

        Defendants.

_____/

# O R D E R

**THIS CAUSE** is before the Court on Defendant Ellit Groups, LLC's

Motion to Dismiss Second Amended Verified Complaint (Doc. 39; Motion) filed

on July 16, 2020.  In the Motion, Ellit Groups, LLC (Ellit) seeks dismissal of

Plaintiff CJS Solutions Group, LLC, d/b/a The HCI Group (HCI)'s Second

Amended Verified Complaint (Doc. 35; Complaint), filed on June 26, 2020, for

lack of personal jurisdiction under Rule 12(b), Federal Rules of Civil Procedure

(Rule(s)).[1]  HCI filed a response to the Motion on August 5, 2020.[2]  See HCI's

---

[1]    Although Ellit does not specify in the Motion the subsection of Rule 12(b) on which it relies, upon review of the Motion it is apparent that Ellit seeks dismissal of the Complaint under Rule 12(b)(2) for lack of personal jurisdiction.  See generally Motion; Rule 12(b)(2).

[2]    The Court granted HCI's motion for an extension of time to file a response to the Motion, thus Ellit timely filed its Response.  See HCI's Unopposed Motion for an Extension of Time to

Response to Ellit Groups' Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 59; Response).  With leave of Court, Ellit filed a reply to HCI's Response on August 24, 2020.  <u>See</u> Ellit Group's LLC's Reply to Plaintiff's Response in Opposition to Defendant's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 70; Reply).  Accordingly, the Motion is ripe for review.

## I.   Procedural History

HCI initiated this action on December 19, 2019, by filing its Verified Complaint for Injunctive Relief in the Circuit Court, Fourth Judicial Circuit, in and for Duval County, Florida.  <u>See generally</u> (Doc. 1-1).  On January 24, 2020, Defendant Jason Huckabay removed the case to this Court.  <u>See generally</u> Doc. 1; Notice.  HCI then filed a Motion for Emergency Injunctive Relief in this Court on January 27, 2020.  <u>See generally</u> Motion for Emergency Injunctive Relief (Doc. 4; Emergency Motion) (originally filed in state court).  The Court held a telephonic hearing the following day, during which the Court discussed its concerns regarding HCI's Emergency Motion, as well as Huckabay's failure to provide sufficient information in the Notice to enable the Court to determine whether it had subject matter jurisdiction over the instant action.  <u>See</u> Clerk's Minutes (Doc. 8).[3]  The Court directed Huckabay to file an amended notice of

---

File a Respond to Ellit Group's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 48), filed on July 27, 2020; <u>see also</u> Order (Doc. 49), entered on July 28, 2020.

[3]      Only HCI and Defendant Huckabay attended the hearing.  Defendant Stephen Tokarz had not yet made an appearance in the case, and Defendant Ellit Groups, LLC was not yet a party to the action.  <u>See</u> Clerk's Minutes.

removal. Id. He did so on February 10, 2020. See Amended Notice of Removal with Joinder of Co-Defendant Stephen Tokarz (Doc. 14; Amended Notice). Upon review of Huckabay's Amended Notice, the Court determined that it has subject matter jurisdiction over this action. See Doc. 15; Order, entered on February 11, 2020.

On May 11, 2020, with leave of Court, HCI filed an amended complaint naming Ellit Groups, LLC as an additional Defendant. See generally First Amended Verified Complaint (Doc. 26). Thereafter, on May 27, 2020, HCI filed an executed Waiver of Service form reflecting that Ellit waived formal service of process. See Fed. R. Civ. P. 4(D) Waiver of Service of Summons (Doc. 32).

On June 26, 2020, again with leave of Court, HCI filed the second amended complaint, which is the operative pleading at this time. See generally Complaint. Defendants Tokarz and Huckabay each answered the Complaint on July 16, 2020. See Defendant Stephen Tokarz's Answer and Affirmative Defenses to Plaintiff, The CJS Solutions Group, LLC, d/b/a The HCI Group's, Second Amended Verified Complaint (Doc. 36); Defendant Jason Huckabay's Answer and Affirmative Defenses to Plaintiff, The CJS Solutions Group, LLC, d/b/a The HCI Group's, Second Amended Verified Complaint (Doc. 37). That same day, Defendant Ellit filed the instant Motion, seeking to dismiss HCI's claims against Ellit under Rule 12(b) for lack of personal jurisdiction.

On July 16, 2020, HCI filed a motion seeking preliminary injunctive relief. See Motion for Preliminary Injunction (Doc. 42; Preliminary Injunction Motion). The Court held a hearing on HCI's Preliminary Injunction Motion on August 12, 2020, see Clerk's Minutes (Doc. 65), and at a subsequent hearing on August 20, 2020, denied preliminary injunctive relief.  See Clerk's Minutes (Doc. 69); see also Transcript (Doc. 74).  Notably, at each relevant stage of the proceedings, Ellit has reiterated its challenge to the Court's exercise of personal jurisdiction over it.  See, e.g., Clerk's Minutes (Doc. 69) ("The parties stipulate that to the extent that Ellit elects to begin discovery in this case and participate in mediation, any such action will not be a waiver of its challenge to personal jurisdiction.").

## II.    Standard of Review

When considering a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the "plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction."  See United Techs. Corp. v. Mazer, 556 F.3d 1260, 1274 (11th Cir. 2009).  Where a defendant "challenges jurisdiction by submitting affidavit evidence in support of its position, 'the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'"  See id. (quoting Meier ex rel. Meier v. Sun Int'l Hotels, Ltd., 288 F.3d 1264, 1269 (11th Cir. 2002)).  In ruling on a motion

to dismiss for lack of personal jurisdiction, a district court has discretion to conduct an evidentiary hearing.  See Delong Equip. Co. v. Wash. Mills Abrasive Co., 840 F.2d 843, 845 (11th Cir. 1988).  However, where the court does not conduct a hearing, "the plaintiff must present only a prima facie showing of . . . personal jurisdiction."  Id.

A plaintiff makes a prima facie showing by presenting evidence sufficient to withstand a motion for directed verdict on the issue of personal jurisdiction. Morris v. SSE, Inc., 843 F.2d 489, 492 (11th Cir. 1988).  Thus, "[t]he district court must construe the allegations in the complaint as true, to the extent they are uncontroverted by defendant's affidavits[,]" and "where the evidence presented by the parties' affidavits . . . conflicts, the court must construe all reasonable inferences in favor of the non-movant plaintiff."  Id.  (citing Delong Equip. Co., 840 F.2d at 845); see also United Techs. Corp., 556 F.3d at 1274 (citing Polski Linie Oceaniczne v. Seasafe Transp. A/S, 795 F.2d 968, 972 (11th Cir. 1986)) (noting that, if the defendant rebuts the jurisdictional allegations in the plaintiff's complaint, "the plaintiff is required to substantiate [its] jurisdictional allegations [ ] by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint.").

### III.   Background[4]

Plaintiff HCI asserts that it is one of the largest full-service organizations offering healthcare information technology services to clients throughout the United States and internationally.  See Complaint ¶¶ 7-9.  Defendants Tokarz and Huckabay previously owned and managed Expert Technical Advisors (ETA), a Texas limited liability company that specialized in the healthcare information technology recruiting industry.  Id. ¶ 10.  On January 15, 2016, HCI purchased ETA.  Id. ¶ 12; see also Asset Purchase Agreement (Doc. 35-1; Asset Purchase Agreement).  As part of the purchase, HCI agreed to employ Tokarz and Huckabay as high-level HCI employees.  Id. ¶¶ 12-14.  Additionally, as an inducement for HCI to purchase ETA, the Asset Purchase Agreement included a restrictive covenant applicable to the members of ETA, see Asset Purchase Agreement at 27, and required Tokarz and Huckabay to sign employment agreements that contained restrictive covenants, including a non-compete

---

[4]      Any facts recited here are drawn from HCI's Complaint along with the evidence submitted by the parties concerning the question of personal jurisdiction.  However, these facts may well differ from those that ultimately can be proved.  In support of the Motion, Ellit filed the Declaration of Pamela Saechow on July 16, 2020.  See Declaration of Pamela Saechow (Doc. 40; Saechow Dec'l).  Additionally, in the Motion, Ellit cites to the deposition testimony of Defendant Stephen Tokarz, which HCI submitted in support of its Preliminary Injunction Motion.  See Motion at 12, 13, 19; see also Videoconference Deposition of Stephen Tokarz June 17, 2020 (Doc. 43-2; Tokarz Dep.).  In support of its argument that the Court has personal jurisdiction over Ellit, HCI attaches several documents to the Response, including what appear to be printouts obtained from domain name information registries (Docs. 59-1, 59-2), and travel expense reimbursement requests that Tokarz apparently submitted to Ellit for the date range of June 16, 2019, to June 21, 2019 (Doc. 59-3).

provision in favor of HCI, a confidentiality provision, and a non-solicitation provision, <u>see</u> Complaint ¶¶ 14, 20, 22, 23.

On February 28, 2019, Defendant Ellit Groups, LLC, a Texas limited liability company, was formed. <u>See</u> <u>id.</u> ¶ 26; <u>see also</u> Saechow Dec'l ¶ 3. At that time, Pamela Saechow, the Chief Executive Officer of the company, was the sole member. <u>See</u> Saechow Dec'l ¶ 5. However, in August of 2019, Tokarz, Huckabay, and several others executed an agreement formally recognizing them as members of Ellit. <u>Id.</u> By the terms of the written agreement, both Tokarz and Huckabay were to be treated as members of Ellit as of the date of its formation in February 2019. <u>See</u> Saechow Dec'l; <u>see also</u> Company Agreement (Doc. 43-3) at 9, 37. As of February of 2019, Tokarz was employed as the Chief of Staff at HCI, and was a Florida citizen living in Florida. <u>See</u> Complaint ¶¶ 19, 27, 28. It is unclear whether Huckabay was ever a Florida citizen.

Ellit competes in the same industry as HCI. <u>See</u> Complaint ¶ 30. However, Ellit has never maintained an office or agency in Florida, never been registered or licensed to do business in Florida, and has never applied to do business in Florida. <u>See</u> Saechow Dec'l ¶ 7. Similarly, Ellit has neither attempted to, nor conducted, any business or business ventures in Florida, nor has it engaged, retained, provided services for, or solicited any client or customer located in Florida. <u>Id.</u> ¶ 8. Additionally, Ellit has never billed nor received any revenue from any business, individual, or other source in Florida. <u>Id.</u> Ellit has

no employees, members, managers, representatives, or agents located in Florida. Id. ¶ 9.

In the Complaint, HCI asserts breach of contract claims against Tokarz and Huckabay, respectively, and seeks both injunctive relief and damages. See Complaint at ¶¶ 38-71. HCI also asserts two claims against Ellit. In Count V of the Complaint, HCI alleges that Ellit tortiously interfered with HCI's business relationships, and in Count VI, alleges that Ellit tortiously interfered with HCI's contractual relationships with Tokarz and Huckabay. See Complaint ¶¶ 72-87. By way of background for its various claims, HCI alleges that "before and after Ellit's [] formation," Tokarz, Huckabay, and others "shared HCI's confidential and proprietary information, including but not limited to HCI's pricing information, presentations, client or potential client pipelines, and databases of consultants," which HCI maintains violated Tokarz and Huckabay's employment agreements and fiduciary responsibilities to HCI. Id. ¶ 32. HCI also asserts that immediately upon Ellit's formation, Ellit with Tokarz and Huckabay began competing with HCI by soliciting business from HCI's current and prospective customers, and preparing a bid for the exact same project on which HCI was bidding—Alameda Health Systems (Alameda), a hospital system in the State of California. Id. ¶¶ 33, 35; see also Saechow Dec'l ¶ 10. Ellit does not dispute that it submitted a bid in response to Alameda's "Solicitation for Quotes, IT Training and Activation Support for

S.A.P.P.H.I.R.E. Initiative, dated April 25, 2019." Saechow Dec'l ¶ 10. However, according to Ms. Saechow, "Ellit never possessed, considered, or used any of [HCI's] information, including any HCI bid or response information, in bidding, presenting, applying for, or responding to the [Alameda] Solicitation." Id. ¶ 11. Additionally, "Ellit did not involve, consult with, or retain [Tokarz] in connection with Ellit's response to the [Alameda] solicitation." Id. ¶ 12. On or about May 7, 2019, Ellit learned from Alameda that it was one of two finalists Alameda had selected to make a presentation at Alameda's facilities in California. Id. ¶ 13. Alameda did not select HCI as a finalist. Id. After Ellit's selection as a finalist, Ellit "enlisted Stephen Tokarz as an Epic subject matter expert, to assist with the on-site [Alameda] presentation." Id. ¶ 14. Ellit then "engaged [Tokarz] on a full-time basis in July of 2019," and he received his first compensation on August 9, 2019. Id. ¶ 15.

HCI maintains that the Defendants "conspired to breach Tokarz's and Huckabay's Non-Compete Provisions, Confidentiality Provisions, and Non-Solicitation Clauses," and "further conspired to interfere with HCI's ongoing attempts to win business while Tokarz was still employed as HCI's chief of staff." See Complaint ¶ 34. Additionally, HCI contends that after their employment with HCI ended, Tokarz and Huckabay engaged in a conspiratorial scheme with Ellit to violate their employment agreements, alleging that:

a. [Tokarz and Huckabay] violated the Non-Compete Provision by directly competing with HCI, and through [Ellit] have acquired several healthcare information technology contracts worth millions of dollars. In particular, [Ellit] was awarded a multi-million-dollar contract with [Alameda] . . . Tokarz, as HCI's chief of staff, was one of the lead executives for HCI in charge of its extensive bid and proposal to acquire the Alameda Project through HCI's response to Alameda's Solicitation for Quotes. At the same time Tokarz was overseeing HCI's bid for the Alameda Project, [Ellit] was simultaneously preparing and submitting a bid for the same exact Alameda Project. [Ellit] ultimately won the Alameda Project bid, as Ellit Groups was able to undercut HCI's pricing structure because Ellit, through Tokarz, knew precisely the pricing and work that was being bid on by HCI.

b. Tokarz and Huckabay both serve as Executive Vice Presidents for [Ellit]. Thus, their roles as Members of Ellit Groups are not merely passive, but instead, Tokarz and Huckabay are actively involved in managing [Ellit], procuring new clients for [Ellit], and servicing [Ellit]'s existing clients in the field, as demonstrated by their reimbursements for tens of thousands of dollars' worth of expenses servicing the Alameda Project, alone. Further, Jason Huckabay's name appears explicitly as "Exec Oversight" in [Ellit]'s bid for the Alameda Project.

c. Tokarz and Huckabay violated the Confidentiality Provisions by using confidential information learned while employed at HCI, client contacts and lists acquired at HCI, pricing and other sensitive financial information to directly and indirectly compete with HCI. Tokarz and Huckabay had access to and utilized HCI's proprietary databases of potential activation staff who were capable of performing the work, and violated their positions of trust and fiduciary duties to HCI by misappropriating HCI's bid materials, presentations, and databases for the express purpose of undercutting HCI's bid for the Alameda Project through [Ellit].

d. Tokarz and Huckabay violated the Non-Solicitation Clauses by actively attempting to and actually acquiring for [Ellit], at least two different current or prospective clients of HCI. This loss of

customers and clients of HCI amount to millions of dollars of lost revenue and profits to HCI.

e.  Discovery is highly likely to reveal additional violations of the Employment Agreements and/or the Asset Purchase Agreement, and the above-references list is not intended to be comprehensive.

Complaint ¶ 35.  With respect to Count V, HCI specifically alleges that

At the time of Ellit Groups' formation:

a. Tokarz and Huckabay were subject to contractual obligations to be performed in the State of Florida;

b. Tokarz was a citizen of Florida and working for employed [sic] by HCI in Florida through April 30, 2019, serving thereafter as an independent contractor for HCI through May 31, 2019;

c. Ellit Groups' members were in possession of and/or continued to receive HCI groups' proprietary, confidential, trade secret information and received some or all of that information over the internet sent by Tokarz from Florida;

d. Tokarz was simultaneously a member and Executive Vice President of Ellit Groups and performed work on Ellit Groups' behalf while a citizen of Florida;

e. Ellit Groups likely had other contacts with the State of Florida subjecting it to in personam jurisdiction in Florida that are likely to be revealed through discovery.

On or about April 25, 2019, Alameda Health System sent a Solicitation for Quotes for its IT Training and Activation support for S.A.P.P.H.I.R.E. Initiative (which has been referred to herein as the "Alameda Project").  HCI was one of the companies Alameda invited to bid for the Alameda Project.  Ellit Groups knew HCI was one of the companies preparing a bid for the Alameda Project.  Ellit Groups was also invited to bid on the Alameda Project.  Ellit Groups bid, however, was illegally competitive, resulting in unjust disruption and interference with HCI's bid to win the Alameda

Project. Not only was Ellit Groups' mere existence to compete with HCI improper from the outset due to the composition of its members Tokarz and Huckabay (whom it also employed as Executive Vice Presidents), but Ellit Groups was in possession of and used HCI's confidential and proprietary pricing information and other information that Ellit Groups illegally obtained through Tokarz, which gave Ellit Groups an unfair advantage in bidding the Alameda Project.  As a result of Ellit Groups' unjust interference with HCI's attempt to win the Alameda Project, and other projects that will be revealed through discovery, HCI has been damaged and continues to be damaged in an amount greater than $75,000 that will be determined at trial.

Complaint ¶¶ 73-80.  Additionally, as to Count VI, HCI asserts that

The Employment Agreements and Asset Purchase Agreements are valid, written contracts.  The restrictive covenants in the Employment Agreements and the Asset Purchase Agreement explicitly survived the termination of Tokarz's and Huckabay's employment with HCI.  Ellit Groups knew that the Employment Agreements and Asset Purchase Agreement existed, were valid, and contained restrictive covenants.

Ellit Groups, unjustly interfered with the Employment Agreements and Asset Purchase Agreements in at least the following ways:

a. Tokarz and Huckabay are Members and Executive Vice President employees of Ellit Groups, a business formed to compete directly with HCI;

b. By obtaining and using HCI's confidential pricing information, consultant databases, presentations, and other confidential, proprietary or trade secret information belonging to HCI;

c. By submitting bids to compete with HCI for the same projects and work;

d. By soliciting HCI's past, current, and prospective clients;

e. By soliciting HCI's past and current employees;

f. Other means of unjust and tortious interference that are likely to be learned through discovery.

There was no legal justification for Ellit Groups' interference with the Employment Agreements and Asset Purchase Agreement. As a result of Ellit Groups' unjust interference with the Employment Agreements and Asset Purchase Agreement, HCI has been damaged and continues to be damaged in an amount greater than $75,000 that will be determined at trial.

Complaint ¶¶ 82-87.

## IV.   Discussion

### A. Applicable Law

"A federal district court in Florida may exercise personal jurisdiction over a nonresident defendant to the same extent that a Florida court may, so long as the exercise is consistent with federal due process requirements." See Licciardello v. Lovelady, 544 F.3d 1280, 1283 (11th Cir. 2008). "If both Florida law and the United States Constitution permit, the federal district court may exercise jurisdiction over the nonresident defendant." Id. Thus, to determine whether personal jurisdiction exists over Defendants, the Court must engage in a two-part inquiry. See Mut. Serv. Ins. Co. v. Frit Indus., Inc., 358 F.3d 1312, 1319 (11th Cir. 2004). First, the Court must determine "whether the exercise of jurisdiction is appropriate under [Florida]'s long-arm statute." Id. (citing Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623, 626 (11th Cir. 1996)). Second, the Court must consider whether exercising personal jurisdiction over a defendant is consistent with "the Due Process Clause of the Fourteenth

Amendment to the United States Constitution, which requires that the defendant have minimum contacts with the forum state and that the exercise of jurisdiction over the defendant does not offend 'traditional notions of fair play and substantial justice.'" Id. (quoting Sculptchair, Inc., 94 F.3d at 626). "Only if both prongs of the analysis are satisfied may a federal or state court exercise personal jurisdiction over a nonresident defendant." Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 256 (11th Cir. 1996) (internal quotations omitted).

### 1. Florida's Long-Arm Statute[5]

The reach of Florida's long-arm statute is a question of Florida law. See Meier, 288 F.3d at 1271. Thus, this Court must construe the long-arm statute as would the Florida Supreme Court, and, absent some indication that the Florida Supreme Court would hold otherwise, this Court is bound to adhere to decisions of Florida's intermediate courts. See id. In relevant part, Florida's long-arm statute provides:

---

[5]    The Court notes that Florida's long-arm statute—Florida Statutes section 48.193—confers two types of jurisdiction. See NW Aircraft Capital Corp. v. Stewart, 842 So. 2d 190, 193-95 (Fla. 5th DCA 2003). First, section 48.193(1) lists enumerated acts which will confer specific personal jurisdiction over a defendant for suits arising from those acts. See Fla. Stat. § 48.193(1). Next, section 48.193(2) "provides that Florida courts may exercise general personal jurisdiction" if the defendant engages in "substantial and not isolated activity in Florida[,]" whether or not the claims asserted actually involve the defendant's activities in Florida. See Carmouche v. Tamborlee Mgmt., Inc., 789 F.3d 1201, 1203-04 (11th Cir. 2015) (emphasis in original). In the Complaint, HCI does not specify whether it seeks to invoke specific or general jurisdiction over Ellit. See generally Complaint. However, in the Response, HCI expressly relies on section 48.193(1)(a)(2.) as conferring personal jurisdiction over Ellit. Therefore, the Court will consider only whether it can exercise specific personal jurisdiction over Ellit.

> (1)(a) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:

> 2. Committing a tortious act within this state.

Fla. Stat. § 48.193. The Court notes that while the term "arising from" as used in Florida Statutes section 48.193(1)(a) "does not mean proximately caused by, it does require direct affiliation, nexus, or substantial connection to exist between the basis for the plaintiff['s] cause of action and the defendant['s action falling under the long-arm statute]." NW Aircraft Capital Corp., 842 So. 2d at 194; see also Glovegold Shipping, Ltd. v. Sveriges Angfartygs Assurans Forening, 791 So. 2d 4, 10 (Fla. 1st Dist. Ct. App. 2000).

Florida Statutes section 48.193(1)(a)(2.) authorizes the exercise of jurisdiction over a non-resident defendant who commits a tortious act within Florida. See Fla. Stat. § 48.193(1)(a)(2.). However, "a defendant's physical presence is not necessary to commit a tortious act in Florida." See Wendt v. Horowitz, 822 So. 2d 1252, 1260 (Fla. 2002). Rather, a nonresident defendant can commit a tortious act in Florida under section 48.193(1)(a)(2.) by way of telephonic, electronic, or written communications into Florida, so long as the tort alleged arises from such communications. See Internet Solutions Corp. v. Marshall, 39 So. 3d 1201, 1208 (Fla. 2010) (emphasis in original); Wendt, 822

So. 2d at 1253.  In addition, "[a]ccording to precedent binding [in the Eleventh Circuit,] subsection [(1)(a)(2.)] extends long-arm jurisdiction over defendants who commit a tort that results in injury in Florida."  Posner v. Essex Ins. Co., Ltd., 178 F.3d 1209, 1219 (11th Cir. 1999); Licciardello, 544 F.3d at 1283; Estate of Scutieri v. Chambers, 386 F. App'x 951, 955 (11th Cir. 2010).  Notably, "[t]he Florida Supreme Court has provided only limited guidance on the question of when a tort committed out of state but causing injury in Florida is sufficient to give Florida courts personal jurisdiction over the tortfeasor," and Florida's intermediate appellate courts are divided on the issue.  See Estate of Scutieri, 386 F. App'x at 955 (citing Wendt, 822 So. 2d at 1253 n.2); see also Internet Solutions, 39 So. 3d at 1206 n.6 ("We do not decide the broader issue of whether injury alone satisfies the requirement of section [48.193(1)(a)(2.)].").  Indeed, courts have questioned whether section 48.193(1)(a)(2.) is properly understood "to encompass all tortious acts which were complete outside Florida but ultimately have consequences here only because a Florida resident suffers damages."  See Korman v. Kent, 821 So. 2d 408, 411 (Fla. 4th DCA 2002) (emphasis added); Arch Aluminum & Glass Co., Inc. v. Haney, 964 So. 2d 228, 232-35 (Fla. 4th DCA 2007); see also Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A., 421 F.3d 1162, 1168 & n.7 (11th Cir. 2005) (citing Korman, 821 So. 2d at 411, for the proposition that "Wendt cannot be construed to grant jurisdiction under [section 48.193(1)(a)(2.)] in every situation where a

tort was completed out-of-state but caused injury in Florida"). Nevertheless, "[u]nless and until the Florida Supreme Court rejects [the Eleventh Circuit's] construction of the long-arm statute" this Court is "bound to follow [the] 'firmly established precedent, which interprets subsection [(1)(a)(2.)] to apply to defendants committing tortious acts outside the state that cause injury in Florida.'" See Estate of Scutieri, 386 F. App'x at 955 (quoting Posner, 178 F.3d at 1217).

### 2. Constitutional Due Process

In addition to determining the reach of Florida's long-arm statute, the Court must consider whether the exercise of personal jurisdiction over Ellit in this case "would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which requires that the defendant have minimum contacts with the forum state and that the exercise of jurisdiction over the defendant does not offend 'traditional notions of fair play and substantial justice.'" Mut. Serv. Ins. Co., 358 F.3d at 1319 (quoting Sculptchair, Inc., 94 F.3d at 626).

In specific personal jurisdiction cases, the Eleventh Circuit applies a three–part test to determine whether a court's exercise of personal jurisdiction over a defendant would violate due process. See Louis Vuitton Malletier, S.A. v. Mosseri, 736 F.3d 1339, 1355-56 (11th Cir. 2013). Specifically, courts are to examine: "(1) whether the plaintiff's claims 'arise out of or relate to' at least one

of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" Id. at 1355 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-73 (1985); Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 413-14 (1984); Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); Oldfield v. Pueblo De Bahia Lora, S.A., 558 F.3d 1210, 1220-21 (11th Cir. 2009); and Sculptchair, Inc., 94 F.3d at 630-31).

With regard to the first prong, the Eleventh Circuit explains that "a fundamental element of the specific jurisdiction calculus is that [the] plaintiff's claim must arise out of or relate to at least one of the defendant's contacts with the forum." Id. (quoting Fraser v. Smith, 594 F.3d 842, 850 (11th Cir. 2010) (additional citation omitted)). The court's inquiry "must focus on the direct causal relationship between the defendant, the forum, and the litigation." Id. (quoting Fraser, 594 F.3d at 850 (internal quotation marks and additional citations omitted)). Indeed, "a relationship among the defendant, the forum, and the litigation is the essential foundation of in personam jurisdiction." Id. at 1355-56 (quoting Helicopteros Nacionales, 466 U.S. at 414). In determining whether a defendant's tortious act is sufficiently connected to the forum, the

Eleventh Circuit has instructed that a tort arises out of or relates to the defendant's activity in a state only if the activity is a "but-for" cause of the tort. Waite v. All Acquisition Corp., 901 F.3d 1307, 1314 (11th Cir. 2018), cert. denied sub nom. Waite v. Union Carbide Corp., 139 S. Ct. 1384, 203 L. Ed. 2d 611 (2019) (quoting Oldfield, 558 F.3d at 1222-23 (internal quotation marks omitted)).[6]

As to the second prong, in intentional tort cases, there are "two applicable tests for determining whether purposeful availment occurred." Louis Vuitton, 736 F.3d at 1356. Courts may utilize the "effects test" set forth by the Supreme Court in Calder v. Jones, 465 U.S. 783, 790 (1984). As the Eleventh Circuit explained, "[u]nder the 'effects test,' a nonresident defendant's single tortious act can establish purposeful availment, without regard to whether the defendant had any other contacts with the forum state." Louis Vuitton, 736

---

[6]     HCI fails to address the question of whether its two claims against Ellit arise from or are related to Ellit's contacts with Florida. See generally Complaint; Response. Instead, HCI cites Posner, 178 F.3d at 1220, for the proposition that the question of "whether the claim 'arises from' or is 'related to' the acts complained of" is "per se satisfied" when the plaintiff asserts a claim for an injury caused by an intentional tort. See Response at 6, n.2. Specifically, HCI asserts that in Posner, the court "dispens[ed] with [the] relatedness inquiry in considering a tortious interference claim." Id. However, this facile reading of Posner misapprehends the court's due process analysis. Rather than dispensing with the relatedness inquiry outright, the Posner court implicitly found that the plaintiff's tortious interference claims arose from the defendant's specific contacts with Florida. See Posner, 178 F.3d at 1220-21 (Noting that "If true, these allegations [of the defendant's contacts with Florida] show that [the defendant] directed activity into Florida with respect to [plaintiff's] insurance claims, satisfying the minimum contacts requirements."). Indeed, the Court's review of relevant caselaw reveals no per se rule as described by HCI, and any such rule would appear to conflict with the well-established specific jurisdiction analysis. See, e.g., Waite, 901 F.3d at 1314; Walden v. Fiore, 571 U.S. 277, 134 S.Ct. 1115 (2014); Louis Vuitton, 736 F.3d at 1355. Accordingly, as part of the Court's due process analysis, the Court will consider whether HCI's claims arise from Ellit's contacts with Florida.

F.3d at 1356 (citing <u>Licciardello</u>, 544 F.3d at 1285).  This test requires a plaintiff to demonstrate that the defendant committed a tort that was: "(1) intentional; (2) aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state."  <u>See</u> <u>Licciardello</u>, 544 F.3d at 1285-86, 1287-88.  In lieu of, or in addition to, the <u>Calder</u> effects test, a court may "apply a traditional purposeful availment analysis."  <u>Louis Vuitton</u>, 736 F.3d at 1356.  Under the traditional minimum contacts approach, courts "assess the nonresident defendant's contacts with the forum state and ask whether those contacts: (1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum."  <u>Id.</u> at 1357 (citing <u>S.E.C. v. Carrillo</u>, 115 F.3d 1540, 1542 (11th Cir. 1997)).  In doing so, courts "identify all contacts between a nonresident defendant and a forum state and ask whether, individually or collectively, those contacts satisfy these criteria."  <u>Id.</u> (citing <u>King & Hatch, Inc. v. S. Pipe & Supply Co.</u>, 435 F.2d 43, 46 (5th Cir. 1970)).

With respect to the third prong, a court must determine whether the exercise of jurisdiction over the nonresident defendant "would offend 'traditional notions of fair play and substantial justice.'"  <u>Sculptchair, Inc.</u>, 94 F.3d at 630-31 (quoting <u>Robinson</u>, 74 F.3d at 258).  Factors relevant to this inquiry include

"the burden on the defendant, the forum's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief and the judicial system's interest in resolving the dispute." Licciardello, 544 F.3d at 1288 (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-92 (1980)).

## B. Analysis

### 1. Florida's Long-Arm Statute

As noted, HCI relies exclusively on Florida Statutes section 48.193(1)(a)(2.) as conferring personal jurisdiction over Ellit, based upon its allegations that Ellit committed intentional torts that caused injury to HCI in Florida. See generally Response.  Ordinarily, before a court may determine whether this subsection supports the exercise of personal jurisdiction over a defendant, the Court must determine whether the plaintiff has sufficiently pled a claim that the defendant committed an intentional tort. See PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V., 598 F.3d 802, 808, n.8. (11th Cir. 2010) (observing that "[i]n Florida, before a court addresses the question of whether specific jurisdiction exists under the long-arm statute, the court must determine 'whether the allegations of the complaint state a cause of action,'" and "[t]he same is true where the plaintiff is relying on the theory of general personal jurisdiction") (quoting Wendt v. Horowitz, 822 So.2d 1252, 1260 (Fla. 2002) (additional citation omitted)).  Here, Ellit does not argue that HCI's claims for

tortious interference with a business relationship or tortious interference with a contract are insufficient as a matter of Florida law.[7]  <u>See generally</u> Motion; Reply.  Thus, the Court will assume for purposes of this analysis that HCI has properly asserted tortious interference claims against Ellit.

Ellit does, however, dispute whether HCI's claims fall within the reach of Florida's long-arm statute.  In this regard, Ellit argues that HCI fails to allege facts or tortious conduct sufficient to satisfy section 48.193(1)(a)(2.) because HCI's claim that it suffered damages in Florida is insufficient to allow Florida to exercise jurisdiction over it.  <u>See</u> Motion at 11, 13-14.  In response, HCI contends that the analysis whether Florida's statute confers jurisdiction over Ellit is "remarkably straightforward," because Florida Statute section 48.193(1)(a)(2.) "permits the exercise of jurisdiction if the foreign tortious act caused injury within the forum even though the tortious act occurred outside of Florida."  <u>See</u> Response at 4, 5.  Ellit's arguments notwithstanding, the Court is "bound to follow 'firmly established precedent, which interprets subsection [(1)(a)(2.)] to apply to defendants committing tortious acts outside the state that

---

[7]     Although Ellit argues that HCI does not set forth sufficient jurisdictional allegations in the Complaint to demonstrate that the Court can properly exercise specific personal jurisdiction over Ellit under section 48.193, <u>see</u> Motion at 8, Ellit's arguments appear to be related to the question whether there exists a direct affiliation, nexus, or substantial connection between the basis for the HCI's causes of action and Ellit's actions falling under the long-arm statute, as required by Florida law, <u>see generally</u> Motion.  Indeed, Ellit does not cite authority regarding the elements of claims of tortious interference or breach of contract under Florida law; nor does it cite authority regarding the standard of review for motions to dismiss brought under Rule 12(b)(6), or assert that HCI has failed to state a claim to relief under Florida law.  <u>See generally</u> Motion; Reply.

cause injury in Florida.'"  See Estate of Scutieri, 386 F. App'x at 955 (quoting Posner, 178 F.3d at 1217).[8]

Here, HCI alleges that "HCI is a Florida limited liability company with its principle place of business in Jacksonville, Duval County, Florida," that "[a]s a result of Ellit Groups' unjust interference with HCI's attempt to win the Alameda Project, and other projects that will be revealed through discovery, HCI has been damaged and continues to be damaged," and that "[a]s a result of Ellit Groups' unjust interference with the Employment Agreements and Asset Purchase Agreement, HCI has been damaged and continues to be damaged." See Complaint ¶¶ 1, 80, 87.  The Court finds that these allegations are sufficient to assert that HCI suffered injury in Florida as a result of Ellit's alleged tortious interference with HCI's contractual and business relationships for purposes of Florida Statute section 48.193(1)(a)(2.).  Therefore, the Court determines that

---

[8]    Ellit cites Metnick v. Levy, P.A. v. Seuling, 123 So. 3d 639, 645-46 (Fla. 4th DCA 2013), PK Computers, Inc. v. Indep. Travel Agencies of Am., Inc., 656 So. 2d 254, 255 (Fla. 4th DCA 1995), Hunt v. Cornerstone Golf, Inc., 949 So. 2d 228, 230 (Fla. 4th DCA 2007), and Don King Productions v. Mosley, No. 15–61717–CV–WILLIAMS, 2016 WL 3950930, at *4 (S.D. Fla. 2016), for the proposition that "Florida courts have repeatedly recognized that for there to be jurisdiction over a tortious interference claim under 48.193(1)(a)(2.), the interference must occur within the state or arise from conduct within (or directed into) the state."  See Motion at 13.  The Court reads these cases as examples of the split in authority referred to in Estate of Scutieri, 386 F. App'x at 955.  Irrespective of these opinions, this Court will follow Eleventh Circuit precedent that extends long-arm jurisdiction under Florida Statute section 48.193(1)(a)(2.) to defendants who commit a tort out of state but cause injury in Florida.  See Estate of Scutieri, 386 F. App'x at 955.

Florida's long-arm statute permits the exercise of personal jurisdiction over Ellit as to both Counts V and VI.[9]  Estate of Scutieri, 386 F. App'x at 955.

## 2. Due Process

The Court's determination that it may exercise specific personal jurisdiction over Ellit under Florida's long-arm statute does not end the analysis, rather, the specific jurisdiction inquiry under Florida's long-arm statute is distinct from the due process inquiry required by the Constitution. See Madara v. Hall, 916 F.2d 1510, 1514-15 (11th Cir. 1990) (citing Venetian Salami Co. v. Parthenais, 554 So.2d 499, 500 (Fla.1989)).  Therefore, in addition to the issue of long-arm jurisdiction, the Court must engage in the three-part due process analysis described in Louis Vuitton, 736 F.3d at 1355.

Before doing so, however, the Court will address HCI's primary argument that under Calder, HCI's allegations that Ellit committed intentional torts that caused injury to HCI in Florida, alone, are sufficient to confer personal jurisdiction over Ellit.  See Response at 4, 6, and 8.  In making this argument, HCI concedes that "Ellit's intentional interference with HCI's potential and

---

[9]     Because this is a case based on specific jurisdiction, the personal jurisdiction inquiry is conducted "as to each claim separately."  See KVAR Energy Sav., Inc. v. Tri-State Energy Solutions, LLP, No. 6:08-cv-85-Orl-19KRS, 2009 WL 103645, at *3 (M.D. Fla. Jan 15, 2009); see also Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 275 (5th Cir. 2006) (citing 5B Charles Alan Wright & Arthur Miller, Federal Practice and Procedure: Civil § 1351, at 299 n.30 (3d ed. 2004) ("There is no such thing as supplemental personal jurisdiction; if separate claims are pled, specific personal jurisdiction must independently exist for each claim and the existence of personal jurisdiction for one claim will not provide the bases for another claim.")).

anticipated business relationship with [Alameda] occurred in California, as did Ellit's use of Tokarz and Huckabay to win that project."  See Response at 7. However, HCI contends that the California focal point of the tort is immaterial where "the effects of those intentional torts committed in California were borne in Florida, as the damages to HCI were incurred [in Florida]."  See Response at 7.  As such, HCI maintains "[b]ecause the injuries resulting from Ellit's interference were felt in Florida . . . HCI's claims satisfy the Calder effects due process test for this Court's exercise of personal jurisdiction."[10]  Id. at 8.  In response, Ellit asserts that HCI incorrectly applies Calder to the extent that HCI argues that to satisfy due process concerns, it need only allege it was harmed by an intentional tort, and that the harm from the intentional tort was felt by HCI in Florida.  See Reply at 1, 2.  The Court agrees.

---

[10]  HCI cites Whetstone Indus., Inc. v. Yowie Grp., Ltd., No. 3:17-CV-1286-J-20JRK, 2018 WL 4194065 (M.D. Fla. July 25, 2018) as a case with "remarkably similar facts," such that "the only substantial difference between that case [and the instant one] is the foreign locale of the defendants in Australia, whereas Ellit is headquartered in Texas."  See Response at 4-5. However, the Court finds reliance on Whetstone as suggesting that effects felt in the forum state are sufficient is misplaced.  In Whetstone, Australian defendants moved to dismiss the complaint for lack of personal jurisdiction under Rule 12(b)(2), but the court denied the motion, holding that the requirements of Florida's long-arm statute had been satisfied because the complaint alleged an intentional tort between two Florida corporations, and the resulting injury and damages occurred within Florida—even though the alleged tortious act occurred in Australia. See id. at *3. Thus, Whetstone supports HCI's position to the extent that injury to a Florida resident as a result of an intentional tort can support personal jurisdiction under Florida's long-arm statute.  However, Whetstone does not support HCI's proposition that due process considerations are per se satisfied merely because a Florida resident allegedly suffers injury in Florida as a result of an intentional tort.  Indeed, in conducting the due process analysis, the Whetstone court ultimately found the Calder effects test satisfied because the intentional tort at issue was "aimed at Florida and those within the jurisdiction," as the defendants "interfered with the relationship and contracts between two Florida corporations." Id.

While HCI is correct that the single act of a non-resident's commission of an intentional tort can suffice to establish minimum contacts with the forum state under <u>Calder</u>, such an exercise of jurisdiction is proper only when the non-resident defendant commits an intentional tort that was directly aimed at the forum state and caused an injury within the forum state that the defendant reasonably should have anticipated.  <u>See</u> <u>Licciardello</u>, 544 F.3d at 1286; <u>see also</u> <u>Volt, LLC v. Volt Lighting Grp. LLC</u>, 369 F. Supp. 3d 1241, 1246 (M.D. Fla. 2019) (quoting <u>Oldfield v. Pueblo De Bahia, S.A.</u>, 558 F.3d 1210, 1220 n.28 (11th Cir. 2009)).  Indeed, in <u>Walden v. Fiore</u>, 571 U.S. 277 (2014), the Supreme Court observed that even under <u>Calder</u>, it is "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there" that is the focal point of the due process analysis.  <u>See</u> <u>Walden</u>, 571 U.S. at 285-86 (citations omitted).  Further, the Supreme Court in <u>Walden</u> explained that its jurisdictional inquiry in <u>Calder</u> "focuse[d] on 'the relationship among the defendant, the forum, and the litigation.'"  <u>Id.</u> at 286 (citing <u>Calder</u>, 465 U.S. at 788).  Additionally, as the <u>Walden</u> Court noted, in <u>Calder</u>, California properly exercised personal jurisdiction over the defendants because the "crux of [the case] was that the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff."  <u>See</u> <u>Walden</u>, 571 U.S. at 287.  In this regard, the Court instructed that "[t]he plaintiff cannot be the only link between the defendant and the forum.  Rather, it is the defendant's conduct that

-26-

must form the necessary connection with the forum State." Id. at 285 (citations omitted).  "Calder made clear that mere injury to a forum resident is not a sufficient connection to the forum . . . [t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."  Id. at 290. Accordingly, to find the Calder effects test satisfied, Courts within this circuit have required more than mere allegations that a foreign defendant committed an intentional tort that caused harm to a plaintiff residing in the forum state. See Volt, LLC, 369 F. Supp. 3d at 1247; see also Buzz Pop Cocktails Corp. v. Booze Pops, LLC, No. 8:19-cv-1840-MSS-TGW, 2020 WL 2838825, at *7 (M.D. Fla. April 22, 2020); Blue Water Int'l, Inc., v. Hattrick's Irish Sports Pub, LLC, No. 8:17-cv-1584-T-23AEP, 2017 WL 4182405 (M.D. Fla. September 21, 2017); Honus Wagner Co. v. Luminary Grp. LLC, No. 17-cv-61317-BLOOM/Valle, 2017 WL 6547899 (S.D. Fla. Dec. 21, 2017).  Although some courts have "arguably interpret[ed] Calder to authorize personal jurisdiction wherever the plaintiff suffers the 'effects' of an intentional tort, a careful reading of Calder refutes that interpretation."  Blue Water Int'l, Inc., 2017 WL 6547899, at *3.  Therefore, HCI's primary argument that the Calder effects test is satisfied merely due to HCI's alleged injury in Florida as a result of Ellit's alleged tortious acts is

unavailing.[11]  Having dispensed with HCI's primary argument, the Court will conduct the three-part analysis as to each claim HCI asserts against Ellit.  See Louis Vuitton, 736 F.3d at 1355; see also KVAR Energy Sav., Inc., 2009 WL 103645 at *3.

    a. **Count V – Ellit's Alleged Tortious Interference with HCI's Business Relationships**

The Court begins with the first prong of the Louis Vuitton due process analysis, which requires the Court to determine whether HCI's claim in Count V arises from Ellit's contacts with Florida.  As noted, HCI makes no attempt to explain how its claim in Count V arises from Ellit's contacts with Florida.  See supra n.6.  Upon review of the allegations in the Complaint, the record, and the relevant legal authority, the Court determines that HCI has not satisfied the first prong of the Louis Vuitton analysis as to the tortious interference with

---

[11]    HCI cites New Lenox Indus., Inc. v. Fenton, 510 F. Supp. 2d 893, 904 (M.D. Fla. 2007) in support of its argument that "[b]ecause the only two alleged causes of action against Ellit are intentional torts, the Court can apply the Calder test and find that the commission of the intentional torts alone are sufficient to establish personal jurisdiction over Ellit even if it had no other contacts with [Florida]."  See Response at 6.  However, not only does the New Lenox decision predate Walden, which crystallized the Court's ruling in Calder, the portion of the New Lenox opinion upon which HCI relies appears to be a statement by the court outlining the elements of the Calder effects test, compare New Lenox, 510 F. Supp. 2d at 904 ("[W]here a defendant's tortious conduct is intentionally and purposefully directed at a resident of the forum, the minimum contact requirement is met, and the defendant should anticipate being haled into court in that forum."), with Calder, 465 U.S. at 790 ("In this case, [defendants] are primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them is proper on that basis."), rather than the court's application of it.  Notably, the plaintiff in New Lenox alleged not only a breach of contract causing injury in Florida, but also that the defendants committed torts in Florida because one defendant travelled to Florida to misappropriate the plaintiff's information and then defendants marketed the stolen information at trade shows in Florida.

business relationship claim set forth in Count V.  Indeed, concerning its claim in Count V of the Complaint, HCI concedes in its Response that Ellit's alleged interference with HCI's business relationship with Alameda "occurred in California, as did Ellit's use of Tokarz and Huckabay to win that project."  See Response at 7.  The Court accepts HCI's characterization of the conduct forming the basis of its first claim against Ellit.  These assertions make plain both that Ellit's alleged interference with Alameda occurred in California and that the claim HCI presents in Count V does not arise from Ellit's contacts with Florida. See generally Complaint; see also Louis Vuitton, 736 F.3d at 1355-56.  As such, HCI fails to satisfy the first prong of the due process analysis as to this claim.

Even if the Court were to assume, arguendo, that HCI had established the first prong, HCI nonetheless remains unable to satisfy the second.  In the Response, HCI argues that due process considerations are satisfied under both "the Calder effects test and [the] traditional minimum contacts test."  See Response at 6.  However, the Court finds that HCI cannot carry its burden under either approach.  Louis Vuitton, 736 F.3d at 1355-56.  First, HCI cannot satisfy the Calder effects test, because—as HCI itself recognizes—California is the focal point of HCI's claim that Ellit interfered with HCI's business relationship with Alameda.  See generally Complaint; see also Response at 7.  Indeed, Ellit is alleged to have "unjustly disrupt[ed] and interfere[d]" with HCI's relationship with Alameda, a hospital system in California.  On these facts, it cannot be said

that Ellit's alleged tortious interference with HCI's business relationship with Alameda was in any way "directed at" or "expressly aimed" at Florida, as necessary to satisfy the second prong of the <u>Calder</u> effects test. <u>Louis Vuitton</u>, 736 F.3d at 1356; <u>Licciardello</u>, 544 F.3d at 1285-86. Second, HCI has not established that Ellit had minimum contacts with Florida sufficient to satisfy the traditional purposeful availment test. This is so because HCI fails to demonstrate that Ellit's contacts with Florida relate to the claim in Count V, "involve some act by which [Ellit] purposefully availed [itself] of the privileges of doing business within [Florida]," and "are such that [Ellit] should reasonably anticipate being haled into court in [Florida]." <u>See</u> <u>Louis Vuitton</u>, 736 F.3d at 1357. In an attempt to demonstrate Ellit had sufficient minimum contacts in Florida, HCI asserts that both Tokarz and his wife were concurrently members of Ellit and Florida citizens. <u>See</u> Response at 10–12. However, even assuming this to be true, HCI provides no authority to suggest that the citizenship of Ellit's members has any bearing on the question of whether Ellit had constitutionally sufficient minimum contacts in Florida to enable the Court to exercise personal jurisdiction over Ellit as to Count V of the complaint. <u>See generally</u> Response. Indeed, in relying on the Tokarzs' citizenship HCI appears to conflate the determination of a party's citizenship for purposes of invoking diversity jurisdiction with the minimum contacts determination for personal jurisdiction purposes. To the extent that HCI seeks to imply that the Tokarzs'

concurrent Florida citizenship and membership in Ellit alone is sufficient to confer personal jurisdiction over Ellit, such an argument "lacks merit as it blurs principles of diversity jurisdiction and minimum contacts and ignores the Supreme Court's prohibition on 'talismanic jurisdictional formulas.'"   See Carruth v. Michot, No. A-15-CA-189-SS, 2015 WL 6506550, at *7 (W.D. Texas Oct. 26, 2015) (quoting Burger King, 471 U.S. at 486, and citing Kulko v. Cal. Superior Court, 436 U.S. 84, 92 (1978)); see also 19 Tao Vega LLC v. Holo Ltd., No. C 19-5640 SBA, 2019 WL 9607733, at *3 (N.D. Cal. Dec. 17, 2019) ("[T]he citizenship of an LLC's member does not determine personal jurisdiction over the LLC.") (citing Carruth, 2015 WL 6506550 at *7).   Moreover, the "determination of citizenship for diversity jurisdiction and a determination of minimum contacts for personal jurisdiction 'present [ ] distinct due process issues.'" Carruth, 2015 WL 6506550, at *7 (quoting Mountain Funding, LLC v. Blackwater Crossing, LLC, No. 3.05-cv-513-MU, 2006 WL 1582403, at *3 (W.D.N.C. June 5, 2006) (additional citation omitted)).   Thus, HCI's reliance on the Tokarzs' Florida citizenship is unavailing.   HCI also argues that Ellit had constitutionally sufficient minimum contacts in Florida on the basis of HCI's allegation that Ellit's Alameda bid was "illegally competitive" as a result of Ellit's possession and receipt of HCI's confidential information from Florida, but the declaration of Pamela Saechow squarely refutes this allegation.   See Saechow Dec'l ¶¶ 11, 12 ("Ellit never possessed, considered, or used any of

Plaintiff, the HCI Group's information, including any HCI bid or response information, in bidding, presenting, applying for, or responding to the [Alameda] Solicitation. . . . Ellit did not involve, consult with, or retain Stephen Tokarz in connection with Ellit's response to the [Alameda] Solicitation."). Moreover, HCI fails to suggest how that allegation supports even an inference that the tort was directly aimed at Florida or otherwise connects Ellit to Florida in a meaningful way.

Therefore, even setting aside the Court's determination that HCI's claim asserted in Count V does not arise from or relate to Ellit's contacts in Florida, HCI also fails to establish purposeful availment under either the Calder effects test or the traditional minimum contacts test. Accordingly, the Court concludes that its exercise of personal jurisdiction over Ellit would offend due process and Ellit's Motion is due to be granted as to Count V. Louis Vuitton, 736 F.3d at 1356-57.

### b. Count VI – Ellit's Alleged Tortious Interference with HCI's Contractual Relationships

The Court turns next to Count VI, in which HCI alleges that Ellit interfered with HCI's contracts with Tokarz and Huckabay. See Complaint ¶¶ 81-87. First, the Court must determine whether this claim arises from or is related to Ellit's contacts with Florida. Louis Vuitton, 736 F.3d at 1355-56. HCI

maintains that Ellit tortiously interfered with the restrictive covenants in its

agreements with Tokarz and Huckabay based on the following conduct:

> a. Tokarz and Huckabay are Members and Executive Vice President Employees of [Ellit], a business formed to compete directly with HCI;
>
> b. By obtaining and using HCI's confidential pricing information, consultant databases, and other confidential, proprietary or trade secret information belonging to HCI;
>
> c. By submitting bids to compete with HCI for the same projects and work;
>
> d. By soliciting HCI's past, current, and prospective clients;
>
> e. By soliciting HCI's past and current employees;
>
> f. Other means of unjust and tortious interference that are likely to be learned through discovery.

Complaint ¶ 85.  In its Response, HCI fails to explain how this claim arises from

Ellit's contacts with Florida as is necessary to satisfy the threshold due process

consideration.  Supra n.6.  Nevertheless, upon review of the record, the Court

determines that HCI's claim that Ellit tortiously interfered with the contracts

between Tokarz and HCI is sufficiently related to Ellit's contacts with Florida,

but its claim that Ellit tortiously interfered with HCI's contracts with Huckabay

is not.

With regard to Tokarz, he was an HCI employee until April 30, 2019, and

was an independent contractor of HCI's through May 31, 2019, with various

ongoing contractual obligations to HCI—including non-compete obligations

being performed, at the time, in Florida.  <u>See</u> Complaint ¶ 73.  In her declaration Ms. Saechow states that "after its selection as a finalist for the Alameda Solicitation" in early May of 2019, Ellit "enlisted Stephen Tokarz, as an Epic subject matter expert, to assist with the on-site [Alameda] presentation," and "engaged Tokarz on a full-time basis in July of 2019."  <u>See</u> Saechow Dec'l ¶¶ 13, 14, 15.  Ms. Saechow does not specify the date on which Ellit "enlisted" Tokarz to assist with the Alameda presentation, however, Tokarz testified that it was "around [his] birthday, which was May 7" that Ms. Saechow asked if he could participate in the Alameda presentation.   Tokarz Dep. at 49:16-24.  Additionally, Katya Osipova, the program director for the S.A.P.P.H.I.R.E. electronic health record program at Alameda, stated in an affidavit that the Alameda presentation occurred in May of 2019.  <u>See</u> Declaration of Katya Osipova (Doc. 54), ¶¶ 1, 9.  Notably, at the time Ms. Saechow reached out to Tokarz to "enlist" his assistance with the Alameda bid, Tokarz resided in and was a citizen of Florida, and was subject to the restrictive covenants prohibiting competition with HCI, a Florida company.   Tokarz Dep. at 49:25–50:15.  Additionally, while Ellit may not have engaged Tokarz on a "full-time basis" until July of 2019, HCI has presented evidence that Ellit was employing Tokarz in some capacity in mid-June of 2019, which HCI alleges would be in breach of his agreements.  Specifically, HCI presents a reimbursement request approved by Ellit which was submitted by Tokarz with his Ellit email address for travel

to California.  His reimbursement request includes a California hotel receipt, with dates of June 15, 2019, to June 21, 2019, in which Tokarz lists his address in Atlantic Beach, Florida.  See Doc. 59-3, at 3.  Similarly, his flight receipt shows that he flew from Jacksonville International Airport, in Florida, to San Francisco International Airport, in California.[12]  See id. at 4.  Thus, it appears Tokarz remained a Florida resident and citizen until at least mid-to-late June of 2019.  These facts are sufficient to support a finding that HCI's claim that Ellit tortiously interfered with HCI's contractual agreements with Tokarz arises from and relates to Ellit's contacts with Florida.  According to HCI, at the time Ellit "enlisted Stephen Tokarz to assist with the on-site [Alameda] presentation," Tokarz was a Florida citizen, living in Florida still working as an independent contractor with HCI and bound by the restrictive covenants in favor of HCI in the employment agreement and Asset Purchase Agreement.  Moreover, he continued to be a Florida citizen through at least mid-June when Ellit employed him in some capacity, allegedly in violation of his contractual agreements with HCI.   In other words, HCI claims that Ellit tortiously interfered with the contracts between HCI, a Florida company, and Tokarz— then a Florida resident and citizen—by reaching out to Tokarz in Florida to

---

[12]     The flight receipt reflects that Tokarz took a flight from "JAX" to "SFO."  These three-letter airport codes designate Jacksonville International Airport, and San Francisco International Airport, respectively.   See Airport and Facility Codes, Federal Aviation Administration, https://www.faa.gov/nextgen/cip/airport_facility/.

breach his agreements with HCI by assisting Ellit with the Alameda presentation and by employing Tokarz to perform services for Ellit. In this regard, Ellit's contacts with the state—the solicitation and employing of Tokarz, a Florida resident—is the "but-for" cause of the tortious interference; in fact, the contact is inseparable from the tort. Waite, 901 F.3d at 1314. Thus, HCI's claim of tortious interference with its contracts with Tokarz arises from Ellit's contacts with Florida, and HCI has carried its burden to satisfy the first prong of the Louis Vuitton due process analysis. 736 F.3d at 1355-56.

With regard to Ellit's alleged tortious interference with the contractual relationship between HCI and Huckabay, however, HCI has not carried its burden. HCI has failed to present any information suggesting that the claim arises from or is related to any contact with Florida. Indeed, other than the fact that HCI is a Florida company, HCI does not suggest any connection to Florida. HCI does not assert how Ellit tortiously interfered with Huckabay's agreements, when it did so or where Huckabay, who listed a Texas address in the Ellit Company Agreement, resided at the time. Because HCI has failed to establish that its claim that Ellit tortiously interfered with its agreements with Huckabay arises from or is related to Ellit's contacts with Florida, this Court cannot exercise personal jurisdiction over Ellit on this claim. Thus, in turning to the second and third prongs of the due process analysis, the Court limits its consideration to the claim of tortious interference relating to Tokarz.

As to the second prong of the due process analysis, HCI asserts that Ellit expressly aimed its tortious conduct at HCI and Tokarz in Florida, that Ellit knew that HCI and Tokarz were subject to valid agreements, and that HCI suffered injury in the forum as a result of Ellit's tortious interference with those agreements.[13] These allegations are sufficient to satisfy the <u>Calder</u> effects test and the second prong of the due process analysis. <u>Louis Vuitton</u>, 736 F.3d at 1355-56; <u>Licciardello</u>, 544 F.3d at 1286 (setting out the elements of the <u>Calder</u> effects test); <u>cf.</u> <u>DocRX, Inc. v. DOX Consulting, LLC</u>, 738 F. Supp. 2d 1234, 1250 (S.D. Ala. 2010) (concluding that the defendants' alleged tortious interference was aimed at the plaintiff in Alabama for purposes of the <u>Calder</u> effects test); <u>TEKsystems, Inc. v. Modis, Inc.</u>, No. 08 C 5476, 2008 WL 5155667, *3 (N.D. Ill. Dec. 5, 2008) (determining that a defendant's solicitation of plaintiff's employee to breach his employment agreement, and encouragement to misappropriate plaintiff's customer information was sufficient to satisfy the <u>Calder</u> effects test); <u>Whetstone</u>, 2018 WL 4194065 at *3. As the <u>Walden</u> Court explained, for purposes of personal jurisdiction under <u>Calder</u>, "[t]he proper question is . . . whether the defendant's conduct connects him to the forum in a meaningful way." <u>Walden</u>, 571 U.S. at 290. Here, the Court concludes that Ellit's alleged intentional interference with a contract between two Florida residents, where

---

[13]   Although HCI does not refer to the three–part due process test articulated in <u>Louis Vuitton</u>, its arguments in this regard are plainly relevant to this prong of the analysis. 736 F.3d at 1356.

Ellit knew that the contractual obligations were at least at the time being performed in Florida, certainly connects Ellit to Florida in a meaningful way. In contrast to Count V, where the focal point of the tortious activity was California, the focal point of Ellit's tortious interference in Count VI with regard to the agreements with Tokarz, was Florida.  See ISO Claims Servs., Inc. v. Bradford Techs., Inc., No. 3:09-CV-976-J-34JRK, 2011 WL 13176209, at *7 (M.D. Fla. Sept. 28, 2011) (discussing whether Florida was the focal point of the allegedly tortious acts in conducting the Calder analysis).  Therefore, HCI has carried its burden to establish the second prong of the due process analysis.[14] Louis Vuitton, 736 F.3d at 1355-56.

Because HCI has carried its burden of establishing a prima facie case that the Court may exercise personal jurisdiction over Ellit as to the claim in Count VI that Ellit tortiously interfered with HCI's agreements with Tokarz, Ellit must make a "compelling case" that the exercise of jurisdiction over it would violate traditional notions of fair play and substantial justice.  Id. at 1355 ("The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, a defendant must make a compelling case that the exercise of

---

[14]    The Court briefly observes that even if HCI had not satisfied the Calder effects test, it likely would have carried its burden with regard to the traditional purposeful availment analysis.  Indeed, Ellit, having allegedly solicited Tokarz from HCI in Florida, "cannot now claim surprise at being haled into court" in Florida, as Ellit purposefully directed its conduct at Florida such that it could have "reasonably anticipated being sued" here.  Licciardello, 544 F.3d at 1284, 1288.

jurisdiction would violate traditional notions of fair play and substantial justice.").  As noted above, factors relevant to this inquiry "include 'the burden on the defendant, the interests of the forum . . . and the plaintiff's interest in obtaining relief.'"  See Sculptchair, Inc., 94 F.3d at 631 (quoting Asahi Metal Indus. Co. v. Super. Ct. of Cal., 480 U.S. 102, 113 (1987)).

Upon weighing the respective burdens and interests in this case, the Court determines that the exercise of personal jurisdiction over Ellit as to this claim comports with traditional notions of fair play and substantial justice.  Ellit argues that its principal place of business is in Texas, and thus requiring it to litigate this matter in Florida would prejudice it "as virtually all of its witnesses and evidence are either in Texas . . . or California (the site of the [Alameda] project)."  See Motion at 22.  However, a similar argument could be made by many, if not most, nonresident defendants, and does not render the exercise of jurisdiction unconstitutional.  The Supreme Court has instructed that "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  Burger King Corp., 471 U.S. at 477.  Moreover, even if the parties were to litigate this case in Texas, Ellit's California-based witnesses would remain quite distant from the forum.  Ellit contends that Texas courts may hear HCI's tort claims in the same capacity as Florida courts, and Texas has an interest in litigating the

dispute because non-party witnesses will likely reside there.  <u>See</u> Motion at 22.
As to this argument, the Court notes first that the fact that Texas may have an
interest in resolving the dispute is not sufficient to render the exercise of
jurisdiction in Florida unconstitutional.  <u>See</u> <u>Burger King Corp.</u>, 471 U.S. at 483
n.26 ("[M]inimum-contacts analysis presupposes that two or more States may
be interested in resolving potentially conflicting 'fundamental substantive social
policies.'").  Next, and more importantly, the Court finds that because Ellit is
alleged to have knowingly caused injury to HCI in Florida, "Florida has a very
strong interest in affording its residents a forum to obtain relief from intentional
misconduct of nonresidents causing injury in Florida."  <u>See</u> <u>Brennan v. Roman</u>
<u>Catholic Diocese of Syracuse New York, Inc.</u>, 322 F. App'x 852, 857 (11th Cir.
2009) (citing <u>Licciardello</u>, 544 F.3d at 1288).  Finally, although Ellit asserts that
there is no evidence that Texas would be an inconvenient or ineffective forum
for HCI to litigate its claims, this consideration does not constitute a compelling
case that exercising jurisdiction over Ellit would be unreasonable.  <u>Burger King</u>
<u>Corp.</u>, 471 U.S. at 477.  Thus, this Court's exercise of jurisdiction over Ellit on
HCI's Count VI claim that Ellit tortiously interfered with HCI's agreement with
Tokarz will not offend traditional notions of fair play and substantial justice.

## V.     Conclusion

For the foregoing reasons, the Court determines that Florida's long-arm
statute permits the exercise of personal jurisdiction over Ellit as to both Counts

V and VI. Estate of Scutieri, 386 F. App'x at 955. However, with regard to HCI's claim that Ellit tortiously interfered with HCI's business relationships, as set forth in Count V of the Complaint, the Court finds that HCI has not carried its burden of establishing that the alleged tortious activity arises from or relates to Ellit's contacts with Florida, or that Ellit purposefully availed itself of the privileges of conducting activities in Florida—the first two prongs of the Louis Vuitton due process analysis, respectively. 736 F.3d at 1355. Thus, Ellit's Motion is due to be granted to the extent it seeks dismissal of Count V. As to HCI's claims that Ellit tortiously interfered with its agreements with Tokarz and Huckabay, as set forth in Count VI of the Complaint, the Court concludes that HCI has failed to establish that Ellit's alleged tortious interference with its agreements with Huckabay arises from or is related to Ellit's contacts with Florida as necessary to satisfy the first prong of the due process analysis. Id. Consequently, Ellit's Motion is due to be granted to the extent it seeks dismissal of this portion of Count VI. With respect to HCI's remaining claim in Count VI, i.e., that Ellit tortiously interfered with HCI's agreements with Tokarz, the Court finds that HCI has carried its burden of satisfying the first two prongs of the due process analysis. Id. at 1355-56. In turn, Ellit has not made a compelling case that the Court's exercise of jurisdiction over it as to this claim would violate traditional notions of fair play and substantial justice. Id. at 1355.

As such, Ellit's Motion is due to be denied to the extent it seeks dismissal of this portion of Count VI.

Accordingly, it is **ORDERED:**

1. Defendant Ellit Groups, LLC's Motion to Dismiss Second Amended Verified Complaint (Doc. 39) is **GRANTED in part and DENIED in part** as follows:

    a. the Motion is **GRANTED** to the extent that the claim in Count V is dismissed without prejudice,

    b. the Motion is **GRANTED** to the extent that the claim in Count VI that Ellit tortiously interfered with HCI's contractual agreements with Huckabay is dismissed without prejudice, and

    c. in all other respects the Motion is **DENIED**.

2. Ellit shall file an answer to the remaining claim no later than **March 12, 2021**.

**DONE AND ORDERED** in Jacksonville, Florida this 5th day of March, 2021.

**MARCIA MORALES HOWARD**
United States District Judge

lc27
Copies to:
Counsel of Record